UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| JS PRODUCTS, INC., | ) | |
|         Plaintiff, | ) | Case No.  2:11-cv-01856-RCJ-GWF |
| vs. | ) | **ORDER** |
| KABO TOOL COMPANY, | ) | |
|         Defendant. | ) | |

This matter is before the Court on Defendant Kabo Tool Company's Motion to Compel Production of Documents (#42), filed on July 24, 2012, and Plaintiff JS Products, Inc.'s Motion to Compel Discovery (#43), filed on July 27, 2012.  The Court conducted a hearing on these motions on September 13, 2012, during which some of the discovery issues were resolved.  The Court, however, directed counsel for the parties to further meet and confer and attempt to resolve their disputes regarding each party's request for exemplars, photographs and documents relating to the other party's wrench products.  The Court further directed the parties to submit supplemental briefs if they were unable to reach agreement on these issues.  The parties' counsel were not able to reach agreement and have accordingly filed supplemental briefs.  *See* Defendant Kabo Tool's Proposal in Support of Motion to Compel (hereinafter "Kabo's Supplemental Brief") (#76), filed on October 11, 2012 and Plaintiff JS Products, Inc's Supplemental Briefing Regarding Motions to Compel (hereinafter "JS Products' Supplemental Brief") (#77), filed on October 11, 2012.  Kabo Tool has also filed a Response to JS Products' Supplemental Briefing (#78) on October 16, 2012.

. . .

. . .

1                              **BACKGROUND**

2          This case involves claims relating to the alleged infringement of Defendant/
3  Counterclaimant Kabo Tool Company's U.S. Patent No. 7,066,057 (the "'057 patent"). Kabo Tool
4  is a Taiwan company that manufactures various types of tools including wrenches. In the past,
5  Kabo has supplied tools, including wrenches, to JS Products which it has sold or distributed to
6  retailers in the United States, including Lowes. The subject dispute arose after Kabo Tool
7  discovered that JS Products had purchased wrenches from a Taiwanese competitor of Kabo Tool
8  that allegedly infringe the '057 patent. JS Products sold the allegedly infringing wrenches to Lowes
9  under the latter's Kobalt® tool brand. Kabo sent a cease and desist letter to JS Products. Kabo
10 also sent a letter to Lowes advising it that the wrenches sold to it by JS Products infringe the '057
11 patent. Kabo also alleges that in addition to the sales to Lowes, JS Products may have
12 manufactured, distributed or sold other wrenches in the United States that infringe the '057 patent.

13         In response to Kabo's letters, JS Products brought this action in which it seeks a declaratory
14 judgment that the '057 patent is invalid and unenforceable, or, if the patent is valid and enforceable,
15 that JS Products has not infringed the '057 patent. JS Products also seeks damages from Kabo
16 Tool for commercial disparagement and/or corporate defamation. Kabo Tool has counterclaimed
17 against JS Products for patent infringement.

18         The '057 patent states as follows:

19                 A conventional wrench . . . generally includes a handle with a head
                   that includes two jaws. The handle and the jaws are located at the
20                 same plane so that when using the wrench to rotate an object such as
                   a bolt head, the handle and the two jaws are rested on the surface
21                 where the bolt is connected. The user has to lift the handle slightly
                   and insert his fingers in the space between the surface and handle.
22                 However, this also makes the head and the two jaws to be lifted at an
                   angle so that the two jaws embrace the bolt head at an angle. In other
23                 words, only limited clamping area of the two jaws contact the bolt
                   head and this could make the jaws slip away from the bolt head.
24
                   The present invention intends to provide a wrench wherein the two
25                 jaws each have an inclined surface so that the handle is oriented
                   upward when the two jaws are rested on the surface with their
26                 inclined surfaces. By this way, the user can hold the handle
                   comfortably and the bolt head is clamped by the clamping surfaces of
27                 the two jaws.

28         *Complaint (#1), Exhibit A, '057 Patent.*

JS Products notes that the '057 patent is limited to the design of an open-end wrench head with two jaws that have different thicknesses and different inclined angles with respect to each other. *JS Products Supplemental Brief (#77), pg. 5.* The U.S. Patent and Trademark Office rejected Kabo Tool's initial application to patent a wrench design with jaws having a common angle or inclined plane because such wrenches were anticipated in the prior art. Kabo Tool therefore amended its application to provide that the jaws would have different thicknesses and different inclined angles with respect to each other. The Patent Office issued the '057 patent as amended. *See JS Products' Opposition to Motion to Compel (#52), Exhibit 4.* JS Products contends that the '057 patent is nonetheless invalid because wrenches with jaws of different thicknesses and inclined angles were also anticipated in the prior art. JS Products also alleges, however, that the wrenches it purchased from Kabo's competitor and sold to Lowes do not infringe the '057 patent because the jaws of these wrenches have a common angle or inclined plane.

### A. Kabo Tool's Discovery Requests.

Kabo Tool served interrogatories and requests for production of documents on JS Products relating to each and every wrench it has manufactured, distributed, sold, offered for sale, or imported into the United States from June 27, 2006 (the date the '057 patent was issued) to the present. Kabo's Interrogatory No. 2 asked JS Products to identify each of its wrenches by (a) product name, (b) JS Product's internal code name, (c) model, (d) version number, and (e) the dates during which each product was manufactured, distributed, sold, offered, or imported in the United States. Kabo's Request for Production No. 3 asked JS Products to produce two (2) samples of each wrench it sold, offered for sale, displayed, advertised, and/or marketed in the United States.

JS Products objected to Kabo's discovery requests on various grounds including over breath and lack of relevancy. Subject to its objections, JS Products responded to Interrogatory No. 2 by stating:

> The Accused Products were originally referenced by JSP as the "8 pc SAE Cross Form Wrench Set" and the "8pc MM Cross Form Wrench Set," by internal code nos. 359490 and 359491. As noted above, the product which JSP currently refers to by these names no longer has the end jaw configuration of the Accused Product, but instead has a conventional configuration. Also JSP has made, used and/or sold a product it calls the 8" adjustable wrench, part no. 95035. Additional

3

        details regarding this wrench can be found in document numbers JSP00420-JSP000423 produced contemporaneously with these responses. JSP is still investigating the potential existence of other JSP non-conventional wrenches.

JS Products responded to Request for Production No. 3 by stating that it will make available for inspection at its Las Vegas office or for shipping at Kabo's expense, samples of the Accused Products identified by it in response to Interrogatory No. 2. JS Products has agreed to provide documents to Kabo relating to "non-conventional" wrenches that it has sold, offered for sale, displayed, advertised, and/or marketed in the United States since June 27, 2006. JS Products argues, however, that Kabo's requests for samples and documents relating to "conventional" wrenches are irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

JS Products defines a "non-conventional" wrench as an open-end wrench that has inclined or angled jaws, regardless of whether the jaws have different thicknesses or angles as compared each other. This definition includes the alleged infringing wrenches that JS Products purchased from Kabo's Taiwanese competitor and sold to Lowes even though JS Products denies that these wrenches infringe the '057 patent. JS Products defines a "conventional" wrench as a wrench whose jaws are on the same plane as the wrench handle, which is the same definition of "conventional" wrench used by Kabo in the '057 patent.

Kabo argues that it is entitled to production of samples and documents relating to all of JS Products' wrenches, "conventional" or "non-conventional," for the specified time period. Kabo first argues that JS Products has unreasonably reserved the right to decide what constitutes a "conventional" wrench and a "non-conventional" wrench. Kabo argues that it has no way of knowing whether JS Products is withholding relevant documents and information because JS Products has refused to articulate how it differentiates "non-conventional" from "conventional" wrenches.

Kabo further argues that:

> [It] is entitled to this information because it is relevant to the claims and defenses in this case, *i.e.,* to show products infringe, to calculate a reasonable royalty and damages and to establish commercial

4

success. For example, the design, development, manufacture, promotion, and sale of what JSP labels as "conventional" and "non-conventional" wrenches relate to how JSP infringes the patent as the differences between JSP's "conventional" and "non-conventional" wrenches will likely demonstrate JSP's willful infringement. Kabo is also entitled to know how JSP designed and developed its "non-conventional" wrenches and the predecessor products from which it developed its "non-conventional" wrenches. That data for both sets of wrenches is also relevant to track the relative success of the "non-conventional" wrenches versus the so-called "conventional" wrenches. This data is relevant to damages and secondary considerations of non-obviousness because the success of non-conventional wrench sales may prove Kabo's positions on both issues.

*Kabo's Supplemental Brief (#76), pg. 2.*

As an alternative to producing samples of all of JS Products' "conventional" and "non-conventional" wrenches, Kabo argues that JS Products should be required to produce photographs of all "conventional" and "non-conventional" wrenches it has sold, offered for sale, displayed, advertised, and/or marketed in the United States since June 27, 2006. Kabo will then have 10 days from receipt of the photographs to identify the "universe of products at issue in the case and to seek documents sufficient to show the relevant design, marketing, and financial documents; samples; and information related to that universe of products." *Id. at pgs.2-3*.

JS Products responds to Kabo's argument regarding "commercial success" by stating that the core element of a commercial success contention is that the items in issue be comparable. JS Products argues that the commercial success of "conventional" wrench products is not comparable to the commercial success of "non-conventional" wrench products. As a fallback position, JS Products argues that discovery relating to its "conventional" wrenches should be limited to a reasonable period of time prior to and subsequent to the brief time period in 2011 and 2012, when JS Products sold the allegedly infringing wrenches. *JS Products Supplemental Brief (#77), pg. 4*.

**B.    JS Products' Discovery Requests.**

Although JS Products argues that Kabo's discovery requests relating to "conventional" wrenches are irrelevant and should be denied, it nevertheless moves to compel Kabo to produce samples of all of its wrench products for inspection by JS Products. JS Products apparently bases its motion on its Request No. 69 which asked Kabo to produce "all documents and things referring

to, relating to, and/or reflecting any conventional open end wrenches manufactured, produced or sold by [Kabo] in the past 10 years." Kabo objected to this request as overbroad and vague. *See Plaintiff's Motion to Compel (#43), Exhibit 5*.

JS Products argues that production of samples of Kabo's wrenches is relevant to the issue of "manufacturing tolerances" raised by Kabo. JS Products points to the Patent Infringement Verification Report by Kabo's infringement expert, Kuo-Tan Liu, who checked the tilt angle of the "non-conventional" Kobalt® brand wrench that JS Products sold to Lowes in 2011. Mr. Liu determined that the jaws on this wrench had different angles by placing a ruler on the incline surfaces of the wrench. Mr. Liu stated that the difference in the jaw angles "is not an inaccuracy during manufacture." *See Plaintiff's Opposition to Defendant's Motion to Compel (#52), Exhibit 3, Liu Report, pg. 11*. JS Products seeks to explore and possibly refute this assertion by examining the manufacturing variances or tolerances in the angles of Kabo's own wrench products. JS Products further states that Kabo Tool has acknowledged that it never sold the patented wrench in the United States or elsewhere and that Kabo has not identified any other "non-conventional" wrenches manufactured or sold by it. JS Products therefore argues that it is necessary to obtain samples of Kabo's "conventional" wrench products to examine them for manufacturing variances or tolerances in the jaw angles. JS Products is willing to limit its request to "open-end wrenches which were manufactured between 2002 and the present using hand-grinding and hand-polishing" similar to the manner in which the allegedly infringing Kobalt® wrenches were manufactured. *See JS Products Supplemental Brief (#77), pg. 7*.

## DISCUSSION

### 1. Kabo's Motion to Compel.

"The scope of discovery in patent cases 'should be liberally construed' under Federal Rule of Civil Procedure 26(b)(1)." *Dr. Systems, Inc. v. Fujifilm Medical Systems USA, Inc.*, 2008 WL 1724241, *2 (S.D.Cal. 2008), citing *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 237 F.R.D. 618, 621 (N.D.Cal. 2006). Rule 26(b)(1) provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Relevant information need not be admissible at trial if the discovery appears reasonably calculated

to lead to the discovery of admissible evidence. The court, however, may limit discovery based on the considerations set forth in Rule 26(b)(2)(C).

The court in *Dr. Systems, Inc. v. Fujifilm Medical Systems USA, Inc.,* states:

> No bright line rule governs whether discovery can be obtained only for the products expressly accused in infringement contentions. According to one view, "the scope of discovery may include products and services 'reasonably similar' to those accused in the [preliminary infringement contentions]." *Epicrealm Licensing, LLC v. Autoflex Leasing, Inc.*, 2007 WL 2580969, *3 (E.D.Tex. 2007); *see L.G. Electric, Inc. v. Q-lity Computer, Inc.*, 211 F.R.D. 360, 368 (N.D.Cal. 2002) (noting that discovery is not necessarily limited to products specifically identified in initial patent infringement disclosures). . . . According to another view, a party 'only has the right to discover information regarding the alleged infringing service, not the right to discover information on whether it should assert a claim of infringement regarding other services.'" *Id.,* citing *Caritis Tech., Inc. v. Comcast Corp.*, 2006 U.S. Dist. LEXIS 94879, *14-*15 (E.D.Tex. 2006).

2008 WL 1724241, at *3.

*Dr. Systems, Inc.* adopted the view that a party may obtain discovery of other products that are reasonably comparable to the accused product. *Id.*

In *Prism Technologies, Inc. v. Adobe Systems, Inc.*, 2011 WL 6210292, *4-*6 (D.Neb. 2011), the district court reviewed and analyzed the cases from other districts regarding the discovery of products that are "reasonably similar" to the accused products. Based on its review, the court stated that the following guidelines for such discovery appear:

> First, the general contours of a desire for broad discovery apply as much in patent cases as in any other. Second, defendants should have some kind of notice as to the specific theory of infringement. Third, the objects about which the moving party seeks discovery must ordinarily be "reasonably similar" to the already accused products, whether those accusations are made in infringement contentions as required by local rule or, as here, in the course of discovery via answers to defendant's interrogatories. This "reasonably similar" standard must necessarily be determined on a case by case basis, since every patent is different.
>
> Fourth, whether or not the desired information is publicly available will impact the ability of the plaintiff to articulate infringement contentions and discovery requests with specificity. This, in turn, may limit plaintiff's ability to demonstrate how the discovery request is related to products that are "reasonably similar" to already accused products. Finally, all of these factors must be analyzed using a "totality of the circumstances" weighting. *See Honeywell,* 655 F.Supp.2d [650, 658 (E.D.Tex. 2009)].

Kabo's argument that JS Products has unreasonably reserved to itself the right to decide what constitutes a "conventional" wrench and a "non-conventional" wrench lacks merit. JS Products uses the same definition of "conventional" wrench used in the '057 patent. JS Products also defines "non-conventional" wrench as an open-end wrench that has tapered or inclined jaws, regardless of whether the sizes or angles of the jaws are the same or different. These distinctions are reasonably clear and do not create a significant risk that JS Products will use its definitions to avoid disclosing wrench products that potentially infringe the '057 patent.

Based on the guidelines identified by the court in *Prism Technologies, Inc. v. Adobe Systems, Inc.*, Kabo has not shown that the broad discovery it seeks regarding JS Products' "conventional" wrenches is relevant to proving infringement. The '057 patent involves a relatively simple modification in design from that of a "conventional" open-end wrench. The designs of JS Products' "conventional" wrench products have nothing to do with the invention of the '057 patent, other than to further illustrate that the invention of the '057 patent is a variation from the "conventional" design of open-end wrenches. This fact is made evident by the provisions of the patent itself and the illustrations contained therein.

Kabo has also argued that discovery regarding JS Products' "conventional" wrench products is relevant to the issue of damages and to proving a reasonable royalty for use of Kabo's patented invention. 35 U.S.C. § 284 provides that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." The burden of proving damages falls on the patentee. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed.Cir. 2009). *Lucent Technologies* notes that there are two alternative categories of infringement compensation—the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining. "A reasonable royalty is, of course, 'merely the floor below which damages shall not fall.'" *Id.* quoting *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed.Cir. 1983).

*Lucent* discusses two approaches for calculating a reasonable royalty. The first approach, known as the analytical method, focuses on the infringer's projection of profits for the infringing

product. *Id.* citing *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed.Cir. 1986). The second, more common approach, is called the hypothetical negotiation or the "willing licensor-willing licensee" approach. This approach attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. *Id.,* citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n. 13 (Fed.Cir. 1995) (en banc); *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed.Cir. 1986). "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. In other words, if infringement had not occurred, willing parties would have executed a licensing agreement specifying a certain royalty payment scheme. The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed." *Id*. 580 F.3d at 1325.

The district court in *Georgia Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. at 1120, identified a number of factors, some overlapping, that are relevant to determining a reasonable royalty under the hypothetical negotiation approach. The factors include royalties received by the patentee for licensing the patent in suit which may prove or tend to prove an established royalty, and the rates paid by the licensee for the use of other patents comparable to the patent in suit. *Georgia-Pacific* also lists as a factor:

> 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

*Georgia-Pacific*, 318 F.Supp. at 1120.

The prices at which JS Products sells open-end "conventional" wrenches, and the profits it derives from the sale of those wrenches, may provide part of the foundation for determining what, if any, increase in sales value or profit is added to a wrench product by use of the invention in the '057 patent. That information, in turn, may be useful in establishing the reasonable royalty for the use of the invention. JS Products indicated in its answer to Kabo's Interrogatory No. 3 that it has manufactured, distributed or sold a wrench product substantially similar to the allegedly infringing

wrench that JS Products purchased from Kabo's competitor, but which is now fitted with a "conventional" open-end wrench head. Information regarding JS Products' sales and profits from the sale of other "conventional" open-end wrench products may also be relevant in determining the reasonable royalty that should be paid to Kabo for a product that incorporates the invention in the '057 patent. The Court agrees with JS Products, however, that the time frame for such discovery should be limited to the period shortly before, during and after the sale of the allegedly infringing products.

The Court therefore orders JS Products to produce to Kabo for inspection, or to ship to Kabo's counsel at Kabo's expense, two samples of the "conventional" wrench product identified in JS Products' response to Interrogatory No. 3. JS Products should also provide photographs of the other open-end "conventional" wrench products that it has manufactured, distributed, sold or offered for sale in the United States from January 1, 2011 to the present. To the extent that Kabo desires actual samples of the additional "conventional" wrenches, it may request that JS Products send such samples to its counsel at Kabo's expense. JS Products shall also produce documents in its possession, custody and control responsive to Kabo's Request for Production Nos. 18-19, 21-22, 24-28 and 44-45 relating to its "conventional" wrench products for the period from January 1, 2011 to the present.

**2.    JS Products' Motion to Compel.**

Kabo argues in its Response (#78) that the Court should not consider JS Products' argument that Kabo should be required to produce samples of its "conventional" wrench products because JS Products' request was not mentioned in the Court's Minutes of Proceedings (#71). During the September 13, 2012 hearing on the parties' motions, JS Products argued that Kabo should be required to produce samples of its "conventional" wrench products in regard to the issue of manufacturing tolerances. The Court ordered the parties to further confer and attempt to reach an agreement regarding the production of each other's "conventional" wrenches. JS Products' argument that Kabo should be required to produce samples of its "conventional" wrench products is, therefore, not contrary to the Court's September 13, 2012 order.

. . .

The Court is not convinced, however, that JS Products needs samples of all of Kabo's "conventional" wrenches to defend against the allegation that variations in the jaws of the allegedly infringing wrenches are not within the normal manufacturing tolerances. JS Products also fails to recognize that Kabo, in turn, is arguably entitled to inspect all of JS Products' "conventional" wrench products for manufacturing tolerances. While equivalence in discovery is not always required, there should be some equivalency regarding the parties' respective discovery requests for each other's "conventional" wrenches which are not central to either party's claims or defenses.

The Court therefore orders Kabo to produce photographs of the open-end "conventional" wrench products that it has manufactured, distributed, sold or offered for sale in the United States from January 1, 2011 to the present. To the extent that JS Products desires actual samples of the "conventional" wrenches, it may request that Kabo send such samples to its counsel at JS Products' expense. Because JS Products' stated purpose for this discovery is to check the wrenches for manufacturing tolerances or variations, the Court does not order Kabo to produce documents relating to its "conventional" wrench products. Accordingly.

**IT IS HEREBY ORDERED** that Defendant Kabo Tool Company's Motion to Compel Production of Documents (#42) and Plaintiff JS Products, Inc.'s Motion to Compel Discovery (#43) are **granted**, in part, and **denied**, in part, with respect to each party's requests for production of the other's "conventional" wrench products and documents relating thereto. The parties are hereby ordered to produce samples of their "conventional" wrench products and/or documents in accordance with the foregoing provisions of this order.

**IT IS FURTHER ORDERED** that the parties shall make their respective productions in compliance with this order on or before **November 27, 2012.**

DATED this 23rd day of October, 2012.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge