1

2

3

4

5               **UNITED STATES DISTRICT COURT**

6                      **DISTRICT OF NEVADA**

7

8    JS PRODUCTS, INC.,                          )
                                                 )
9                    Plaintiff,                   )     Case No.  2:11-cv-01856-RCJ-GWF
                                                 )
10   vs.                                          )     **ORDER**
                                                 )
11   KABO TOOL COMPANY,                           )
                                                 )
12                   Defendant.                   )
     _____)

13

14          This matter is before the Court on Defendant/Counterclaimant Kabo Tool Company's

15   ("Kabo") Emergency Motion for Sanctions (#254), filed on April 11, 2014.  Plaintiff JS Products,

16   Inc. ("JSP") filed its Opposition to Motion for Sanctions (#267) on April 22, 2014.  Kabo filed its

17   Reply in Support of its Motion for Sanctions (#270) on April 23, 2014.  The Court conducted a

18   hearing in this matter on April 25, 2014.

19                            **BACKGROUND**

20          Kabo, a Taiwanese tool manufacturer, holds U.S. Patent No. 7,066,057 (the "'057 Patent")

21   for a wrench with jaws that have different tilt angles.  Pursuant to Claim One of the patent, the jaws

22   are angled so that they are on a different plane from the wrench handle.  The jaws are also on

23   different planes from each other and the jaws have different thicknesses.  This design allegedly

24   provides for better contact between the jaws and the nut or bolt head to which the wrench is

25   applied.  JSP purchased allegedly infringing wrenches from its Taiwanese supplier Porauto.  These

26   wrenches were manufactured by another Taiwanese tool manufacturer, Jin Wan.  JSP sold the

27   allegedly infringing wrenches in the United States to Lowes Hardware which marketed wrenches

28   under the brand name "Kobalt Cross Form Wrenches" (hereinafter the "accused wrenches").

1    It is undisputed that the jaws of the accused wrenches are on a different plane from the

2    wrench handle.  There is a dispute, however, whether the jaws are designed to be on different

3    planes from each other or to have different thicknesses.  JSP asserts that the slight differences in the

4    planes or thicknesses of the jaws of the accused wrenches, as measured by Kabo's expert, are

5    simply the result of "manufacturing tolerances" and are not a part of the design of the wrenches.

6    JSP also asserts that the differences are so slight as to be commercially meaningless.

7    Prior to December 2012, JSP produced certain drawings of the accused wrench that it

8    obtained from its supplier Porauto.  These drawings have been referred to by the parties as

9    "customer drawings."  Kabo deposed JSP's person most knowledgeable, James Moore, on

10   December 20, 2012.  During the deposition, Kabo's counsel questioned Mr. Moore about angle

11   degrees shown on the drawings which appeared to state a deviation in the prescribed angle of "plus

12   or minus 0°."  Mr. Moore was asked whether this indicated a manufacturing tolerance of zero

13   degrees.  In regard to the customer drawings, Mr. Moore testified that "anytime we have a -- a new

14   tool, as part of our process of collecting and compiling specifications, we request . . . basic

15   specification information, such as overall dimensions, length, width, et cetera.  And if my memory

16   serves me correct, these were provided such that we could have that information." *Declaration of*

17   *John Sganga, (#269), Exhibit 3, Moore Deposition, pg. 157:1-9.*  As to whether "plus or minus 0°,"

18   indicated the manufacturing tolerances for the angles, Mr. Moore testified:

19          . . . well, I know this isn't a detailed print to actually manufacture
             from.  This -- I believe the -- the intent or the scope of this was to just
20          show the dimensional callouts of the -- of the wrench, so I would
             classify this as more of a references document as opposed to a  -- a
21          print.

22               In other words, you couldn't take . . . this drawing and go
             manufacture a wrench from it.  There's just not enough detailed
23          information here.  I guess that's a better way to say what I'm trying to
             say.

24

25   *Moore Deposition, pg. 165:1-14.*

26   Mr. Moore testified that a manufacturing print can vary from product to product, but that

27   "in order to manufacture just products in general, depending on the complexity of the product, you

28   need a certain level of detail with respect to the dimensional values to be able to fully manufacture

2

1    it." *Id., 166:6-12.* Mr. Moore stated that the customer drawings were not "a fully annotated

2    manufacturing print in that it doesn't provide all of the critical dimensions of the wrench." *166:15-*

3    *17.* He testified that JSP did not have a detailed manufacturing print for the accused wrenches

4    because it did not manufacture them. *166:18-23.* Mr. Moore then testified as follows:

5              Q.    Could you get access to a detail manufacturing print for this
                     particular product if you wanted to?

6
               A.    Yes.
7
               Q.    And how would you go about doing that?
8
               A.    I would contact my supplier and -- and request it.
9
               Q.    Did they have any issue of giving you a detail manufacturing print?
10
               A.    Generally not.
11
          *Moore Deposition, pg. 166:18-25; 167:1-8.*
12
          Kabo filed a motion to compel on February 26, 2013 in which it sought production of a
13
     variety of documents and items from JSP, including a copy of the manufacturing drawings or prints
14
     for the accused wrenches.  The Court conducted a hearing on April 2, 2013 during which it
15
     indicated that it would order JSP to produce manufacturing drawings based on Mr. Moore's
16
     testimony that JSP could obtain them from its supplier.  The Court, however, did not issue its
17
     written order granting Kabo's motion to compel until July 3, 2013. *See Order (#202), pg. 3.*
18
          JSP has produced emails showing that Mr. Moore requested manufacturing drawings from
19
     Porauto on April 2, 2013.  On that date, Mr. Moore sent an email to Jerry Hsu of Porauto stating as
20
     follows:
21
                    Back on the 23rd of August during 2011 (see attached email) you
22                  provided me with dimensional drawings of the Kobalt Cross-form
                    wrenches.  Although these were helpful at the time, I need to provide
23                  the original factory production drawings to our patent attorney for
                    review.  Please contact Perry of Jinhua, collect this information and
24                  forward the information to me.  Again, it needs to be the original
                    drawings from Jinhua, not from Porauto.
25
                    If you have any questions, please write to me or call me.
26
          *Declaration of Roger Wiesenauer(#268), Exhibit 2.*
27

28   . . .

3

1    On April 3, 2013, an individual named Alice, responded to Mr. Moore's email as follows:

2         Please refer to the attached files for your reference and proceeding.
          Any question, please let us know.
3
     *Id.*
4
     On April 17, 2013, Alice sent a follow-up email to Mr. Moore which stated as follows:
5
          Please advise whether these are the drawings that you were
6         requesting.  Any problem or further need, please advise.

7    *Id.*

8         Some of the drawings provided by Porauto in April 2013 contained more details than the

9    drawing that were previously provided to JSP.  Porauto also apparently provided another copy of

10   the same drawings that JSP had previously produced to Kabo.  On August 2, 2013, JSP's counsel

11   sent a letter to Kabo's attorney, with enclosures, stating as follows:

12        Pursuant to the Court Order of July 3, 2013 [Docket No. 202], please
          find enclosed the affidavit of Roger Wiesenauer and a disc containing
13        Plaintiff JS Products, Inc.'s document production bearing production
          numbers JSP006123-JSP006157.  Please note that some of these
14        documents are designated "CONFIDENTIAL"and
          "CONFIDENTIAL-ATTORNEY'S EYES ONLY" pursuant to the
15        Protective Order entered in this action.

16   *Kabo's Exhibits filed Under Seal (#257), Exhibit H.*

17        Kabo provided the drawings produced by JSP, along with other documents and testimony,

18   to its mechanical engineering expert S. Philip Buckley.  Mr. Buckley thereafter submitted his expert

19   report dated January 10, 2014.  Mr. Buckley stated that he inspected and measured accused

20   wrenches which had been purchased from a Lowes store.  *Kabo's Exhibits filed Under Seal (#257),*

21   *Exhibit J, Buckley Report, pg. 7.*  Mr. Buckley created a detailed protocol for measuring the angles

22   and thicknesses of the jaws of the accused wrenches.  *Id., pgs. 15-21.*  He measured a total of 74

23   accused wrenches in accordance with this protocol.  The results of his measurements are set forth at

24   pages 25-27 and pages 28-29 of his report.  *Id.*

25        Mr. Buckley stated that the angle measurements showed that "93% of the JSP accused

26   wrenches had a tilt angle relative to the horizontal plane of the first inclined surface different from

27   the tilt angle relative the horizontal plane of the second inclined surface."  *Id., pg. 27, ¶85.*  He

28   further stated:

4

These measurements have been evaluated for infringement based on my review of the '057 patent, the technical documents provided by JSP, and the deposition of James Moore, which provide a tolerance of plus or minus 0 degrees for evaluating differences in tilt angle. (Exs. K-M, KABO_061855-KABO_061888, Ex. F (Moore Depo. Trans.), at 139:3-21, 161:3-162:9, 163:3-165:14, 167:9-14, 174:2-175:5, 176:21-177:5).

*Id., pg. 27*, ¶ 86.[1]

Mr. Buckley stated that the thickness measurements showed that "82% of the JSP accused wrenches had a thickness of the distal end of the first jaw smaller than a thickness of the distal end of the second jaw." *Id., pg. 29*, ¶90. Mr. Buckley further stated:

These measurements have been evaluated for infringement based on my review of the '057 patent, the technical documents provided by JSP, and the deposition of James Moore, which provide tolerances of plus or minus .01 mm for evaluating differences in jaw thickness. Exs. K-M, KABO_061855-KABO_061888, Ex. F (Moore Depo. Trans.), at 139:3-21, 161:3-162:9, 163:3-165:14, 167:9-14, 174:2-175:5, 176:21-177:5).

*Id., pg. 30*, ¶91.

JSP's expert witness Gene Olson prepared a rebuttal expert report, dated February 11, 2014. Mr. Olson stated in his rebuttal report as follows:

33. The Buckley Report (*see* ¶¶ 86, 91) refers to technical drawings (Exhs. K, M). However, the drawings do not contain enough information to determine the dimensions of the wrenches other than those which were actually measured. Exhibit K comprises drawings of full wrenches and what appear to be four or five dimensions for each drawing. Exhibit M also contains drawings of full wrenches and what appear to be four or five measurements for each drawing. These drawings do not contain enough detail for a manufacturer to produce a wrench based solely on these drawings. Based on my experience in the industry, I would consider these drawings to be the type of drawings having enough detail to show the general design concepts to customers, but not to be used for specifying manufacturing processes. Therefore, these drawings are not insightful and would not allow a person of ordinary skill in the art to draw any conclusions about whether other wrenches having the design in the drawings infringe on the claimed invention.

---

[1] Mr. Buckley relied on the drawings produced by JSP as showing manufacturing tolerances for the accused wrenches. For example, the first drawing in Exhibits K and M (which are the same drawings), shows an angle of 9 degrees, plus or minus 0 degrees, on the wrench jaw in relation to the plane of the handle. Mr. Buckley apparently considers any variation in the angle of either jaw from 9 degrees, to be a design element, rather than a variance due to a manufacturing tolerance.

1
2
3
4
5

34. The Buckley Report (*see* ¶¶ 86, 91) also refers to other technical drawings (Exh. L). Although these drawings have more dimensions represented, none of the measurements contain acceptable tolerances for the manufacturing process. I would expect to see many other details specified in a true manufacturing drawing, details which are not contained in Exh. L. Therefore, I don't believe there is enough information to conclude what the dimensions would be of other wrenches made in accordance with the design shown in the drawing, or what range of tolerances would be used.

6

*Kabo's Exhibits filed Under Seal (#257), Exhibit K, Olson Report, pgs. 9-10.*

7

Mr. Olson also opined on Mr. Buckley's measurements of the 74 accused wrenches

8

purchased from Lowes:

9
10
11
12
13

37. I examined the measurement results reported by Mr. Buckley and reported in the Buckley Report, ¶¶ 84, 89. These results show that as measured by Mr. Buckley, the average difference in height between the jaws is about 0.1mm or 100μm. This is about the thickness of an average human hair. I would not expect a user to either see such a small difference in thickness between the two jaws or feel the difference between the two jaws. Without relatively sophisticated measuring equipment, users would not be able to detect any difference in the thickness between the two jaws.

. . .

14
15
16
17
18
19

39. Mr. Buckley's infringement determination, stating an acceptable tolerance of "plus or minus 0.01mm for evaluating differences in jaw thickness," (Buckley Report ¶ 91) appears to be arbitrarily chosen. A difference in thickness of 0.01mm, or 10μm, is about 1/10th the thickness of a human hair. The tolerance for a product through a machining process is around several thousandths of an inch. This is consistent with the testimony of Mr. Moore. Buckley Report, Exh. F, 174:2-22 (stating that the tolerance would be about 0.003 to 0.010 in [or the equivalent of about -.076mm to 0.254 mm]). One of ordinary skill in the art would not evaluate the infringement of a wrench based on a tolerance of 0.01 mm.

20

*Id, Olson Report, pgs. 10-11.*

21

Mr. Olson noted that the '057 patent states that the distal end of the first jaw is smaller than

22

the distal end of the second jaw. He noted that the '057 patent makes no suggestion that the jaws

23

can be reversed and that the distal end of the second jaw can be smaller than the distal end of the

24

first jaw. He further noted, however, that about half of the measurements made by Mr. Buckley

25

showed the first jaw smaller than the second jaw, and the other half showed the second jaw smaller

26

than the first jaw. Mr. Olson stated that there would be no economic or commercial advantage to

27

having a wrench that is purportedly easier to use in one direction, but equally more difficult when

28

used in the opposite direction. *Olson Report, pgs. 11-12*, ¶¶ 41, 42.

6

1    Kabo took Mr. Olson's deposition on April 10, 2014.  *Kabo's Exhibits filed Under Seal*

2  *(#257), Exhibit L, Olson Deposition.*  Mr. Olson confirmed the statements in his February 11, 2014

3  report that Exhibits K, L and M to Mr. Buckley's report were not true manufacturing drawings.

4  *Olson Deposition, pg. 57:1-15.*  Mr. Olson further testified:

5       Q.    And it's your opinion that these drawings were more to show
             the general design concept to customers?

6       A.    Yes.

7       Q.    But they weren't to be used for specifying manufacturing
8             process?

9       A.    Correct.

10      Q.    In your experience in hand tools, would there have been true
             manufacturing drawings for these wrenches?

11      A.    If there were going to be manufactured, they would have to
12            have some.

13      Q.    So you would expect there to be true manufacturing drawings
             because you actually saw the wrenches on a shelf at a Lowe's
14            in Kenosha Wisconsin, right?

15      A.    Yes.

16      Q.    And it would be unusual for there not to be true
             manufacturing drawings; is that right?

17      A.    Yes.

18      *Olson Deposition, pgs. 57:16-24; 58:1-11.*

19      Later in his deposition, Mr. Olson testified that the drawings in Exhibit L to Mr. Buckley's

20  Report (which are the drawings that JSP obtained from Porauto in April 2013) were a "forging

21  drawing."  Mr. Olson was asked to define "forging drawing."  He testified:

22      A.    When a wrench is produced, they're generally a first drawing
23            that is how do you physically get the thing from a piece of
             steel to something that you then machine.  If we look at, for
24            example, number 09 . . . .   If you look at the right hand end
             where there would be a box wrench, not an open end wrench,
25            that looks like just solid, there is no hexagon opening in that.
             So this is how it's forged as a piece of steel before you start
26            machining it.  Similarly on the open end, there's a dimension
             of eight.  Eight millimeters, but it obviously there's got to be
27            some machining tolerance to that.

28      Q.    All right.  So this is not a true manufacturing drawing, is it?

1

A.      No.  It's -- it's a forging drawing that will lead to a
manufacturing drawing.

2

*Kabo's Reply (#270), Exhibit A, Olson Deposition, pgs. 68:20-24; 69:1-13.*

3

## DISCUSSION

4

Rules 37(a)(2)(A) of the Federal Rules of Civil Procedure provides that the Court may

5

impose a variety of sanctions on a party who disobeys a discovery order.  Sanctions may include an

6

order directing that matters embraced in the order or other designated facts be taken as established

7

for purposes of the action, prohibiting the disobedient party from supporting or opposing

8

designated claims or defenses, striking pleadings in whole or in part, dismissing an action in whole

9

or in part or rendering a default judgment, or treating the violation of the order as contempt.

10

Instead of, or in addition to, such sanctions, the court must also order the disobedient party or its

11

counsel to pay the reasonable expenses, including attorney's fees, caused by the failure, unless it

12

was substantially justified or other circumstances make an award of fees unjust.  Fed.R.Civ.Pro.

13

37(a)(2)(C).

14

Kabo argues that severe sanctions should be imposed on JSP for its failure to produce

15

detailed manufacturing documentation and original factory drawings for the accused wrenches as

16

this Court ordered on July 3, 2013.  *See Order (#202), pg. 3*.  Kabo further argues that JSP

17

misrepresented that the drawings it produced on August 2, 2013 were the final manufacturing

18

drawings for the accused wrenches, when it knew or should have known that they were not.[2]  Kabo

19

argues that the Court should impose "terminating sanctions," i.e. enter a judgment against JSP for

20

infringement, and should also award Kabo monetary sanctions.  Alternatively, Kabo requests that

21

the Court give the following jury instruction:

22

On July 3, 2013, the Court ordered JSP to produce original
manufacturing drawings of the accused products.  The Court has
determined that JSP violated this Order and failed to produce such
drawings.  Consequently, the Court has determined that you, the jury,
shall infer that these non-produced documents would have shown
that the JSP Accused Products infringed the '057 Patent.

23

24

25

26

27

[2] Kabo also asserted that JSP obtained or reviewed the final manufacturing drawings for the
accused wrenches, but withheld production thereof to Kabo.  The Court finds no evidence to support this
assertion.

28

1      *Motion for Sanctions (#258), pg. 16.*

2      The requested instruction would effectively direct the jury to return a verdict against JSP on

3      the issue of infringement.

4      JSP argues that it complied with the Court's order by requesting the original factory

5      drawings from Porauto on April 2, 2013.  JSP further argues, notwithstanding the testimony of its

6      expert witness Mr. Olson, that it has no reason to believe that the drawings obtained from Porauto

7      in April, 2013 and produced to Kabo on August 2, 2013, are not the manufacturing drawings for

8      the accused wrenches.  JSP argues, in any event, that it has never had possession, custody or control

9      of the manufacturing drawings which are in the possession, custody and control of the Taiwanese

10     manufacturer, Jan Win.  JSP therefore argues that Kabo's motion for sanctions should be denied.

11     In  *Henry v. Gill Industries,* 983 F.2d 943, 948 (9th Cir. 1993), the Ninth Circuit set forth

12     the standards governing the imposition of  "terminating sanctions" as follows:

13         "Because the sanction of dismissal is such a harsh penalty, the district
           court must weigh five factors before imposing dismissal: (1) the
14         public's interest in expeditious resolution of litigation; (2) the court's
           need to manage its dockets; (3) the risk of prejudice to the party
15         seeking sanctions; (4) the public policy favoring disposition of cases
           on their merits; and (5) the availability of less drastic sanctions."
16         *Porter v. Martinez*, 941 F.2d 732,733 (9th Cir. 1991) (citations and
           internal punctuation omitted).

17

18     The first two factors favor the imposition of sanctions in most cases, while the fourth factor

19     cuts against a dismissal or default sanction.  Thus, the key factors are prejudice and the availability

20     of lesser sanctions. *Henry,* 983 F.2d at 948, *citing Wanderer v. Johnson*, 910 F.2d 652, 656 (9th

       Cir. 1990).

21

22      For dismissal or default to be proper, the conduct to be sanctioned must also be due to the

23     willfulness, fault or bad faith of the sanctioned party. *Henry*, 983 F.2d at 947-48, *citing Fjelstad v.*

24     *American Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir. 1985); *see also Valley Engineers Inc. v.*

25     *Electric Engineering Company*, 158 F.3d 1051 (9th Cir. 1998);  *Anheuser-Busch, Inc. v. Natural*

26     *Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (applying same test under court's inherent

27     power to sanction); and *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006) (applying same

28     test under court's inherent power to sanction).  "'[D]isobedient conduct not shown to be outside the

1    control of the litigant' is all that is required to demonstrate willfulness, bad faith or fault." *Henry,*

2    983 F.2d at 948, *citing Fjelstad ,* 762 F.2d at 1341.  In deciding whether dismissal or default is

3    warranted, the court may consider all of the offending party's discovery conduct.  *Henry*, 983 F.2d

4    at 947, *citing Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1411 (9th Cir. 1990).

5           In *Anheuser-Busch, Inc. v. Natural Beverage Distributors, Inc.*, 69 F.3d 337, 348 (9th Cir.

6    1995), the court stated:

7               It is well settled that dismissal is warranted where, as here, a party
                has engaged deliberately in deceptive practices that undermine the
8               integrity of judicial proceedings: "courts have inherent power to
                dismiss an action when a party has willfully deceived the court and
9               engaged in conduct utterly inconsistent with the orderly
                administration of justice." *Wyle,* 709 F.2d at 589 (upholding
10              dismissal of complaint pursuant to the court's inherent power where
                plaintiff's denials of material fact were knowingly false and plaintiff
11              willfully failed to comply with discovery orders); (additional citations
                omitted).
12
        The court also held that Anheuser-Busch suffered prejudice because it was forced to rely on
13
     incomplete and spotty evidence in attempting to prove its damages.  *Anheuser-Busch, Inc.,* 69 F.3d
14
     at 353-354.  The court stated that there is a due process concern to the prejudice requirement.  Due
15
     process requires that there exist a relationship between the sanctioned party's misconduct and the
16
     matters in controversy such that the transgression threatens to interfere with the rightful
17
     determination of the case.  The court also stated that belated compliance with the court's order does
18
     not cure the prejudice or avoid the imposition of sanctions:
19
                Additionally, tendering documents after the first trial and one or two
20              months before the second trial was to begin cannot cure the prejudice
                to Anheuser.  This court has squarely rejected the notion that a failure
21              to comply with the rules of discovery is purged by belated
                compliance.  *Henry,* 983 F.2d at 947;  *see also North Am. Watch*
22              *Corp.,* 786 F.2d at 1451 (holding "[l]ast minute tender of documents
                does not cure the prejudice to opponents nor does it restore to other
23              litigants on a crowded docket the opportunity to use the courts."); *G-*
                *K Properties v. Redevelopment Agency of San Jose*, 577 F.2d 645,
24              647-48 (9th Cir. 1978) (holding "last minute tender" of relevant
                documents does not cure effects of discovery misconduct).
25
          *Anheuser-Busch, Inc.,* 69 F.3d at 354.
26
          In *Leon v. IDX Systems Corp.*, 464 F.3d 951, 960 (9th Cir. 2006), the court discussed
27
     whether the district court properly considered the imposition of less drastic sanctions before it
28

1    ordered the sanction of dismissal. The court considered (1) whether the district court explicitly

2    discussed the feasibility of less drastic sanctions and explained why such alternative sanctions

3    would be inappropriate; (2) whether the court implemented less drastic sanctions before ordering

4    dismissal; and (3) whether the district court warned the party of the possibility of dismissal before

5    ordering dismissal. *Valley Engineers Inc. v. Electric Engineering Company*, 158 F.3d 1051, 1057

6    (9th Cir. 1998), states, however, that it is not always necessary to impose less severe sanctions first,

7    or to give any explicit warning of the dismissal sanction:

8            Like most elaborate multifactor tests, our test has not been what it
             appears to be, a mechanical means of determining what discovery
9            sanction is just. The list of factors amounts to a way for a district
             judge to think about what to do, not a series of conditions precedent
10           before the judge can do anything, and not a script for making what
             the district judge does appeal proof. . . .

11
             The significance of warning is that a sanction may be unfair if the
12           party could not have realized that it was in jeopardy of so severe a
             consequence if it was in error regarding its discovery posture. Rule
13           37 tells all lawyers and their clients that dismissal is possible if they
             violate discovery orders, and direct warnings or other circumstances
14           may make it clear that it is a real risk of continued violation in the
             particular case.

15       The court further stated:

16
             What is most critical for case-dispositive sanctions, regarding risk of
17           prejudice and of less drastic sanctions, is whether the discovery
             violations "threaten to interfere with the rightful decision of the
18           case." *Adriana*, 913 F.2d at 1412. While contumaciousness toward
             the court needs a remedy, something other than case-dispositive
19           sanctions will often suffice. Dismissal is appropriate where a
             "pattern of deception and discovery abuse made it impossible" for the
20           district court to conduct a trial "with any reasonable assurance that
             the truth would be available." *Id.,* at 1057-58, *citing Anheuser-*
21           *Busch, Inc.,* 69 F.3d at 352.

22   *Valley Engineers Inc.*, 158 F.3d at 1057-58.

23           In this case, JSP failed to exercise reasonable care and diligence to comply with the Court's

24   July 3, 2013 order. It was JSP's representative, Mr. Moore, who initially testified that it would be

25   necessary to review the manufacturing drawings or specifications to determine the manufacturing

26   tolerances for the angles and thicknesses of the jaws. Mr. Moore testified that the drawings initially

27   produced by JSP were not manufacturing drawings. He also testified, however, that he should be

28   able to obtain a copy of the manufacturing drawings from JSP's supplier, Porauto. Following the

11

1   hearing on April 2, 2013, Mr. Moore sent an email to Porauto requesting the "original factory

2   production drawings" from the manufacturer.  Porauto responded on April 3, 2013 by emailing

3   attached files which contained drawings of the accused products.  Porauto further stated: "Any

4   question, please let us know."  Porauto followed up on April 17, 2013, stating: "Please advise

5   whether these are the drawings that you were requesting.  Any problem or further need, please

6   advise."  JSP has provided no evidence that it did anything to determine whether the drawings

7   received from Porauto were, in fact, the manufacturing drawings.

8           JSP argues that it does not have the possession, custody or control of the manufacturing

9   drawings and therefore should not be sanctioned for failing to produce them.  The Court, however,

10  ordered JSP to produce the manufacturing documents based on Mr. Moore's December 2012

11  testimony that he could obtain them from JSP's supplier Porauto.  *Order (#202), pg. 3.*  Mr.

12  Moore's April 2013 email exchange with Porauto appears to confirm that testimony.  Although JSP

13  states that it has not reason to believe that the drawings produced by it in August 2013 are not the

14  final manufacturing drawings, its own expert witness states that they are not.  There is no evidence

15  that JSP has made any effort to determine whether there are additional manufacturing drawings for

16  the accused wrenches, as indicated by Mr. Olson in his report and deposition testimony.  The Court

17  therefore concludes that some appropriate sanction should be imposed on JSP for its unreasonable

18  failure to comply with the Court's July 3, 2013 order.[3]

19          The Court concludes, however, that the "terminating sanctions" requested by Kabo are not

20  appropriate.  First, JSP has challenged the validity of the '057 patent.  The manufacturing drawings

21  for the accused wrenches are not relevant to determining whether the '057 patent is valid or invalid.

22  Second, the Court is not persuaded that the Kabo has been materially prejudiced in its ability to

23  prove infringement by JSP's failure to produce the manufacturing drawings.  JSP's expert, Mr.

24  Olson, stated that the differences in angles or planes of the jaws of accused wrenches, as measured

25  ─────────────────

26          [3] Kabo is a tool manufacturer and could presumably determine whether particular drawings are final
    manufacturing drawings.  Kabo has not shown that it adequately inspected the documents produced by JSP

27  in August 2013 to determine whether they were the manufacturing drawings it was seeking.  This cuts
    against the reasonableness of Kabo's assertion that it was blindsided by Mr. Olson's report that the

28  drawings produced by JSP were not the manufacturing drawings.

1   by Kabo's expert Mr. Buckley, are about the thickness of the average human hair.  The differences

2   in the thicknesses of the jaws are about 1/10th the thickness of a human hair.  At the hearing, Kabo

3   did not dispute Mr. Olson's statements regarding the measurements.  Kabo has not provided

4   evidence showing that the differences are outside the range of generally accepted manufacturing

5   tolerances for wrenches such as those at issue.  JSP's expert, Mr. Olson, states that, at least as to

6   thickness of the jaws, the differences are within generally accepted manufacturing tolerances.

7   *Olson Report, pg. 11*, ¶ 39.  The evidence does not provide a reasonable basis to believe that the

8   manufacturing drawings would show that the small differences in the planes and thicknesses of the

9   jaws are the result of design, rather than acceptable manufacturing tolerances.  On this record, there

10   is not a sufficient factual foundation to support a presumption that the manufacturing drawings, if

11   produced, would show infringement of the '057 patent.

12        There is also no evidence that the manufacturing drawings have been destroyed or otherwise

13   cannot be obtained by JSP or Kabo.[4]  To the extent that such drawings do, in fact, exist, the Court

14   orders that JSP request them from Porauto or the manufacturer and produce them to Kabo.  Kabo

15   argues that production of the manufacturing drawings at this stage of the case will require the

16   retaking of depositions, and the conducting of other substantial discovery that will significantly

17   delay this action.  The Court is not persuaded that this is true.  If the manufacturing drawings

18   provide additional details regarding the design and manufacturing tolerances for the angles and

19   thicknesses of wrench jaws, then the parties' experts can adjust their opinions accordingly, and they

20   may be briefly re-deposed on any revisions to their opinions in light thereof.  JSP was not the

21   manufacturer, and re-deposing its personnel should not be necessary.  To the extent that Kabo

22   incurs any added legal expenses because of the belated production of the manufacturing drawings,

23   that can be addressed through an award of expenses pursuant to Rule 37(a)(2)(C).

24   . . .

25   . . .

26

27        [4] Kabo has a separate case pending in this district against Porauto and could possibly seek
production of the drawings directly from Porauto in that action.  *See Kabo Tool Co. v. Porauto Industrial*
28   *Co., Ltd*, Case No.  2:12-cv-01859-LDG-NJK.

1

**CONCLUSION**

2       Based on the foregoing, the Court concludes that JSP violated the Court's July 3, 2013

3   order that it produce the manufacturing drawings for the accused product which its representative

4   stated that he could obtain from JSP's supplier.   The Court concludes, however, that Kabo has not

5   been so prejudiced by JSP's discovery violation that the severe sanction of entering a judgment for

6   infringement against JSP is warranted.   Nor does the record justify an adverse presumption

7   instruction that the manufacturing drawings would show that the accused wrenches infringe the

8   '057 patent.   Any prejudice can be resolved by production of the manufacturing drawings if they

9   are still available.   However, an award of expenses, including attorney's fees to Kabo is justified

10   under the circumstances.   Accordingly,

11       **IT IS HEREBY ORDERED** that Defendant/Counterclaimant Kabo Tool Company's

12   ("Kabo") Emergency Motion for Sanctions (#254) is **granted**, in part, as follows:

13       1.       Plaintiff/Counterdefendant JS Products, Inc. ("JSP") shall promptly request, obtain

14   and produce to Kabo the final manufacturing drawings for the accused wrenches.   JSP shall

15   produce the drawings to Kabo within 10 days from the date of this order, or file a report with the

16   Court regarding the status of its production, including whether the manufacturing drawings still

17   exist.

18       2.       Defendant/Counterclaimant Kabo is awarded its reasonable attorney's fees and costs

19   in regard to its motion for sanctions.   The Court will also consider an application by Kabo for

20   reimbursement of any expenses such as additional expert witness fees, deposition costs, and

21   attorney's fees, that are hereafter incurred as a result of JSP's failure to produce the manufacturing

22   drawings for the accused wrenches as its represented it did on August 2, 2013.

23       3.       Counsel for Kabo shall, no later than 15 days from entry of this order, serve and file

24   a memorandum, supported by the affidavit of counsel, establishing the amount of attorney's fees

25   and costs incurred in the motion addressed in this order.   The memorandum shall provide a

26   reasonable itemization and description of the work performed, identify the attorney(s) or other staff

27   member(s) performing the work, the customary fee of the attorney(s) or staff member(s) for such

28   work, and the experience, reputation and ability of the attorney performing the work.   The

attorney's affidavit shall authenticate the information contained in the memorandum, provide a statement that the bill has been reviewed and edited, and a statement that the fees and costs charged are reasonable.

       4.     Counsel for JS Products shall have 15 days from service of the memorandum of costs and attorney's fees in which to file a responsive memorandum addressing the reasonableness of the costs and fees sought, and any equitable considerations deemed appropriate for the court to consider in determining the amount of costs and fees which should be awarded.

       5.     Counsel for Kabo shall have 11 days from service of the responsive memorandum in which to file a reply.

       DATED this 2nd day of May, 2014.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge