**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| JS PRODUCTS, INC., | ) |
| Plaintiff, | ) 2:11-cv-01856-RCJ-GWF |
| vs. | ) ORDER |
| KABO TOOL COMPANY; CHIH-CHING HSIEH; JOHN DOE ENTITIES I-X; and JOHN DOES XI-XX, | ) |
| Defendants. | ) |

This gripping case turns on the validity of a patent covering wrench jaws. The parties have cross-moved for partial summary judgment, (ECF Nos. 277, 294), and filed numerous motions to seal, (ECF Nos. 281, 289, 297, 317, 328, 349, 357, 365). For the reasons stated herein, the Court: (1) grants Plaintiff JS Products, Inc.'s motion for partial summary judgment as to invalidity, (ECF No. 277); (2) declares Claim 1 of U.S. Patent No. 7,066,057 invalid; and (3) denies Defendant/Counterclaimant Kabo Tool Company's motion for summary judgment as to patent infringement, (ECF No. 294). The Court also grants the pending motions to seal.

**I.   FACTS AND PROCEDURAL HISTORY**

Plaintiff JS Products, Inc. ("JSP") is a Nevada corporation in the business of importing and selling tools. (Compl., ECF No. 1, at 1–2). Defendant Kabo is a Taiwanese company that owns U.S. Patent No. 7,066,057 (the "'057 Patent"), which relates to a wrench with jaws that have different tilt angles. (*Id*. at 1–2; '057 Patent, ECF No. 1, at 8).

On August 29, 2011, counsel for Kabo sent JSP a letter stating that Kabo owned the '057 Patent and that Kabo believed certain wrenches imported into the United States and sold by JSP (the "Accused Products") infringed on the '057 Patent. (Compl., ECF No. 1, at 2). Kabo further demanded that JSP cease and desist its allegedly infringing activity. (*Id*. at 2–3). In a responsive letter, JSP acknowledged Kabo's demand but disagreed with its allegations and detailed several alleged defects in Kabo's infringement theory. (*Id.* at 3).

On November 17, 2011, JSP initiated the instant action against Kabo, claiming: (1) that JSP is entitled to a declaratory judgment of non-infringement and invalidity and/or unenforceability of the '057 Patent (claim 1); (2) intentional interference with contractual relations and/or prospective economic advantage (claim 2); and (3) commercial disparagement and/or corporate defamation (claim 3). (*Id*. at 3–5). Kabo has counterclaimed for infringement. (First Am. Countercl., ECF No. 153).

On December 7, 2011, Kabo filed a motion to dismiss claims two and three, which the Court granted, with leave to amend. (Order, ECF No. 33). JSP subsequently filed its First Amended Complaint ("FAC"), in which it has realleged the commercial disparagement and/or corporate defamation claim (now claim 2) and omitted the claim for intentional interference with contractual relations and/or prospective economic advantage. (FAC, ECF No. 34, at 6). The parties have engaged in lengthy, and often contentious, discovery. (*See, e.g.*, Order, ECF No. 245).

**A.    The '057 Patent**

The '057 Patent includes one independent claim and two dependent claims. Specifically, the '057 Patent claims the following:

1. A wrench comprising:

2

> a handle and a head connected to an end of the handle and a first jaw and a second jaw extending from the head, the first jaw having a first inclined surface defined in a first side thereof and the second jaw having a second inclined surface defined in a first side thereof, the first inclined surface and the second inclined surface respectively tapered toward two respective distal ends of the first and second jaws defining respective tilt angles relative to a horizontal plane, the tilt angle relative to the horizontal plane of the first inclined surface is different from the tilt angle relative the horizontal plane of the second inclined surface, so that a thickness of the distal end of the first jaw is smaller than a thickness of the distal end of the second jaw.
>
> 2. The wrench as claimed in claim 1, wherein each respective inclined surface insects a respective root portion of the first and second jaws.
>
> 3. The wrench as claimed in claim 1, wherein each respective inclined surface insects a root portion of the head.

U.S. Patent No. 7,066,057 (filed June 27, 2006). Only the first claim ("Claim 1") is at issue in this case. (*See* JSP Mem. Supp. of Mot. Summ. J. ("JSP Mem."), ECF No. 278, at 6; Kabo Mot. Summ. J., ECF No. 294, at 7–8).

**B.   Prosecution History**

A review of the '057 Patent's prosecution history reveals the difficulty in determining Claim 1's scope. The '057 Patent was issued from U.S. Patent Application Number 10/910,290, filed August 4, 2004 (the "'290 Application"). When Kabo initially filed the '290 Application, it intended to patent a wrench with a pair of jaws with sloping faces or surfaces sharing a common or identical incline. Specifically, the Background of the Invention section of the '290 Application states the following:

> A conventional wrench is disclosed in Fig. 1 and generally includes a handle with a head which includes two jaws. The handle and the jaws are located at the same plane so that when using the wrench to rotate an object such as a bolt head, the handle and the two jaws are rested on the on the surface where the bolt is connected. The user has to lift the handle slightly and insert his fingers in the space between the surface and the handle. However, this also makes the head and the two jaws to be lifted an angle so that the two jaws embrace the bolt head at an angle. In other words, only limited clamping area [*sic*] of the two jaws contact the bolt head and this could make the jaws slip away from the bolt head.

> *The present invention intends to provide a wrench wherein the two jaws each have an inclined surface so that the handle is oriented upward when the two jaws are rested on the surface with their inclined surfaces. By this way, the user can hold the handle comfortably and the bolt head is clamped by the clamping surfaces of the two jaws.*

U.S. Patent Application Serial No. 10/910,290 (filed Aug. 04, 2004) (emphasis added); '057 Patent, col. 1, lines 14–31. Similarly, the Summary of the Invention provides that:

> The present invention relates to a wrench including a handle and a head connected to an end of the handle. A first jaw and a second jaw extend from the head. The first jaw has a first inclined surface defined in a first side thereof and the second jaw has a second inclined surface defined in a first side thereof. The first inclined surface and the second inclined surface are respectively tapered toward two respective distal ends of the first and second jaws. *The first and second inclined surfaces share a common plane which is inclined relative to a horizontal* plane so that when the first and second inclined surfaces are rested on a surface, the handle is oriented upward and the user can comfortably hold the handle while the object is clamped by the two jaws. The present invention will become more obvious from the following description when taken in connection with the accompanying drawings which show, for purposes of illustration only, a preferred embodiment in accordance with the present invention.

'290 Application; '057 Patent, col. 1, lines 35–52 (emphasis added).

Consistent with Kabo's belief that its invention comprised a wrench having jaws with common inclines, Kabo presented claims to that invention in the '290 Application. Indeed, as originally presented in the '290 Application, Claim 1 stated:

> 1.   A wrench 1 [*sic*] comprising:
> a handle and a head connected to an end of the handle and a first jaw and a second jaw extending from the head, the *first jaw having a first inclined surface defined in a first side thereof and the second jaw having a second inclined surface defined in a first side thereof*, the first inclined surface and the second inclined surface respectively tapered toward two respective distal ends of the first and second jaws, *the first and second inclined surfaces sharing a common plane* which is inclined relative to a horizontal plane.

'290 Application (emphasis added). During the prosecution of the '290 Application, however, the Examiner concluded that wrenches with jaws sharing a common plane that is inclined relative to a horizontal plane were anticipated by prior art. (Office Action, ECF No. 41-1, at 28–

4

31 ("Either one of Foor (2,687,056) or Schlehr (1,393,399) discloses all of the limitations of claim 1, i.e., a wrench comprising two jaws extending from the head, each having a first inclined surface in a first side thereof and tapering towards the end of the jaws and sharing a common plane that is inclined relative to a horizontal plane.")). Accordingly, the Examiner rejected Claim 1 as anticipated. (*Id.*).

Seeking to claim an invention distinguishable from the cited prior art, Kabo filed an amendment to the original Claim 1, which incorporated the following additional language: "a thickness of the distal end of the first jaw being *smaller* than a thickness of the distal end of the second jaw so that the tilt angle relative the horizontal plane of the first inclined surface is *different* from the tilt angle relative the horizontal plane of the second inclined surface." (Amendment to the Claims, ECF No. 41-1, at 37) (emphasis added). In an effort to make the '290 Application's specification correspond to the newly claimed invention, Kabo also amended the specification to include the same additional text:

AMENDMENT TO THE SPECIFICATION

> Please replace the paragraph beginning at page 3, lines 9 to 19, with the following rewritten paragraph:
>
> Referring to Figs. 1 to 3, the wrench 1 of the present invention comprises a handle 10 and a head 11 connected to an end of the handle 10. A first jaw 12 and a second jaw 13 extend from the head 11 so as to define a space between the first and second jaws 12, 13. The first jaw 12 has a first inclined surface 120 defined in a first side thereof and the second jaw 13 has a second inclined surface 130 defined in a first side thereof. The first inclined surface 120 and the second inclined surface 130 are respectively tapered toward two respective distal ends of the first and second jaws 12, 13. The first and second inclined surfaces 120, 130 share a common plane which is inclined relative to a horizontal plane. A thickness of the distal end of the first jaw 12 is smaller than a thickness of the distal end of the second jaw 13, **so that the tilt angle relative the horizontal plane of the first inclined surface 120 is different from the tilt angle relative the horizontal plane of the second inclined surface 130 as shown in Fig. 3**. The common plane insects root portions of the first and second jaws 12, 13.

(*Id.* (bold and underline emphasis in the original)); *see also* '057 Patent, col. 2, lines 8–26.

The final language of Claim 1 resulted from the entry of an Examiner's Amendment, which amended Claim 1 to its present form. (Examiner's Amendment, ECF No. 41-1, at 47). The following quotation illustrates how Claim 1 has evolved from its original form (using strikethrough to show deletions and underline to show additions):

> 1.   A wrench comprising:
> a handle and a head connected to an end of the handle and a first jaw and a second jaw extending from the head, the first jaw having a first inclined surface defined in a first side thereof and the second jaw having a second inclined surface defined in a first side thereof, the first inclined surface and the second inclined surface respectively tapered toward two respective distal ends of the first and second jaws~~, the first and second inclined surfaces sharing a common plane which is inclined relative to a horizontal plane~~. <u>defining respective tilt angles relative to a horizontal plane, the tilt angle relative to the horizontal plane of the first inclined surface is different from the tilt angle relative the horizontal plane of the second inclined surface, so that a thickness of the distal end of the first jaw is smaller than a thickness of the distal end of the second jaw.</u>

These changes are critical; instead of covering a wrench with jaws sharing a common plane, Claim 1 now relates to a wrench with inclined jaws that extend at *different* angles (rather than the same angle or on a common plane), which results in the ends of the jaws having different thicknesses.

The '057 Patent, however, lacks significant detail regarding the newly claimed invention. Indeed, the '290 Application did not originally include any text describing the invention now set forth in Claim 1, *see* '290 Application, and the amendment to the specification merely repeats the amended claim language without any additional explanation, *see* '057 Patent, col. 2, lines 8–26. Likewise, the other written portions of the '057 Patent were never amended to correspond to the significant new additions to Claim 1. In fact, some portions still contemplate a wrench with inclined jaws sharing a common plane (i.e., having identical tilt angles). *See, e.g.*, '057 Patent, col. 1, lines 35–52. Accordingly, because the instant dispute, and indeed this entire case, turns on

the meanings of the terms in Claim 1's amended text, the intrinsic record is, at best, of limited value.

**C.  Claim Construction**

On April 17, 2014, following the required *Markman* hearing, the Court entered an order construing four disputed claim terms (the "Claim Construction Order"). (Claim Construction Order, ECF No. 262). Specifically, the Court found that the terms "jaw," "distal ends," and "smaller," as they appear in Claim 1, required no construction. (*Id.* at 18). However, the Court construed the term "different" as meaning "not identical," reasoning:

> JSP argues that the term "different" should be construed as "not identical," (JCCPHS, ECF No. 38, at 2), and Kabo contends that the term requires no construction, (*id.*). The Court agrees with JSP and hereby construes the term "different," as it appears in Claim 1, as meaning "not identical."
>
> The plain meaning of the term "different" is not readily apparent from the '057 Patent. Indeed, and as explained above, the '057 Patent lacks significant detail regarding the invention described in the amended version of Claim 1. *See supra* Part [I.B]. The '290 Application did not originally contemplate a wrench having jaws with "different" tilt angles. *Id.* This limitation was added when Claim 1 was amended. *Id.* The specification, however, was not amended to provide any context for interpreting the new term. In fact, the single amendment to the specification merely repeats the amended claim language without any further description. *Id.* Thus, the specification lacks any detail regarding this new, but extremely significant, limitation, *id.*, and its scope is not immediately clear.
>
> The term "different," as it appears in the '057 Patent, is arguably susceptible to at least two constructions: (1) it could be construed broadly, to mean "not identical," as JSP has proposed; or (2) it could be construed to require a particular type or degree of difference, as Kabo proposed during the claim construction hearing, (Hr'g, Apr. 15, 2014, Las Vegas Courtroom 6B, at 10:07:24 a.m. (arguing that the term different should require "differences that mean something, differences that, at least on the manufacturing side, when you are actually manufacturing, you can get down, you can make that difference, you can have that precision, and that's what we are talking about in this case"); *id.* at 10:08:10 ("Difference can't mean identical because identical suggests that there can't be any difference whatsoever.")).
>
> The Federal Circuit has construed the term "different" on at least two occasions. In *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1379 (Fed. Cir.

2005), the court upheld a broad construction similar to "not identical." However, in *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340 (Fed. Cir. 2008), the court concluded that the term "different" required a particular type of difference, and not merely any conceivable difference.

The patent in *Sorensen* pertained to a method of spacing plastic mold sections during sequential steps of plastic injection molding. 427 F.3d at 1377. The claim in question required "injecting a second plastic material having *different characteristics* than the first plastic material . . . ." *Id.* at 1378 (emphasis added). The Federal Circuit construed "different characteristics" to mean "*any difference* in characteristics between the two injected materials," including a difference in color alone, and concluded that the term did not require the disputed material to have different molecular properties. *Id.* at 1379 (emphasis added).

The court in *Kyocera* distinguished *Sorensen* and declined to adopt its unqualified construction:

> Qualcomm also contends that this court's construction of the same claim term in [*Sorensen*], mandates a broad construction of "different" in this different patent . . . . Qualcomm reads that particular holding to create a rule that use of the claim term "different" without further qualification must mean "any difference."
>
> *Sorensen* created no such categorical rule. In *Sorensen*, this court only discerned a broad meaning for the term "different" after concluding that (a) the claim term in the context of the entire claim connoted that "different" implied any difference in characteristics and (b) the specification and the prosecution history showed "no disavowal of claim scope in relation to material characteristics." This court's analysis of the context of this different claim as a whole, as well as the intrinsic record for this different patent, to arrive at the proper context for the term "different" is thus not inconsistent with *Sorensen.* In sum, the specification and context of the claim term in *Sorensen* did not qualify or limit the nature of the "different" characteristics of the plastic; the specification and context in this case show that the "different" wireless communications means a difference in the method of communication, not simply any conceivable difference. Accordingly, this court sustains the ITC determination that "different" first and second wireless communications refers to two different methods of communication.

*Kyocera*, 545 F.3d at 1349 (internal citations omitted).

   Informed by these two decisions, this Court concludes that an unqualified construction, like the one adopted in *Sorensen*, is the appropriate construction in this case. Like the patent in *Sorensen*, nothing in the '057 Patent qualifies or limits the nature or degree of the "difference" in tilt angle. *See generally* '057 Patent. Likewise, nothing in the prosecution history indicates a disavowal of the claim scope with respect to such differences. Accordingly, a qualified construction like the one adopted in *Kyocera* would be inappropriate, and the Court must conclude that the term "different," as it appears in Claim 1, implies any difference in tilt angle. Stated another way, the Court must conclude that, in the context of the '057 Patent, the plain and ordinary meaning of the term "different" is "not identical." JSP's proposed construction is therefore adopted, and the term "different" is construed accordingly.

   This construction not only reflects the term's plain and ordinary meaning, *see, e.g.*, Oxford English Dictionary (2d ed. 1989) ("OED") *available online at* http://dictionary.oed.com (defining "different" as "A.1.a Having characteristics or qualities which diverge from one another; having unlike or distinguishing attributes; not of the same kind; not alike; of other nature, form, or quality" and as "A.2 . . . denying identity, but without any implication of dissimilarity; not the same, *not identical*, distinct." (emphasis added)), it is also consistent with both *Sorensen* and *Kyocera*, and it avoids a construction that would likely render Claim 1 indefinite under 35 U.S.C. §112(b). Indeed, any interpretation of "different" involving a degree of difference beyond "not identical" cannot be supported by the intrinsic record or any extrinsic evidence (because Kabo has not disclosed any extrinsic evidence to support its proposed construction of the term). While the intrinsic record expresses a relationship—"different from"— it neither discloses a standard for measuring the degree of difference nor provides, to one of ordinary skill in the art, any discernable guidance regarding the extent of the difference the '057 Patent covers. Accordingly, a construction of the term that implies a required type or degree of difference, would likely render the boundaries of Claim 1 undiscernible such that it would not survive a §112(b) invalidity attack. Therefore, the Court declines to adopt such a construction.

(*Id.* at 14–17).

### D. Pending Motions

The parties have now crossed-moved for partial summary judgment. (JSP Mot. Summ. J., ECF No. 278; Kabo Mot. Summ. J., ECF No. 294). JSP argues that Claim 1 is invalid as a matter of law. Specifically, JSP argues that Claim 1 is both anticipated and rendered obvious by the prior art. (*See* JSP Mem., ECF No. 278). In contrast, Kabo contends that it is undisputed that the Accused Products violate the '057 Patent. (Kabo Mot. Summ. J., ECF No. 294). The

Court agrees with JSP in part, finding that Claim 1 is anticipated and consequently invalid. Therefore, the Court need not address JSP's obviousness arguments or Kabo's infringement contentions.

## II. LEGAL STANDARD

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to Federal Rule of Civil Procedure 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## III.   INVALIDITY

This is not a complicated case. At bottom, the critical issue is whether two United States Patents, U.S. Patent No. 1,393,399 ("Schlehr") and U.S. Patent No. 2,687,056 ("Foor"), anticipate Claim 1 of the '057 Patent. The Court finds that they do, and Claim 1 of the '057 Patent is therefore invalid.

"A patent is invalid for anticipation under 35 U.S.C. § 102 if a single prior art reference discloses each and every limitation of the claimed invention." *Allergan, Inc. v. Apotex Inc.*, ––– F.3d ––––, ––––, 2014 WL 2579287, at *3 (Fed. Cir. June 10, 2014) (citing *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003)). For prior art to anticipate a claim "it must be sufficient to enable one with ordinary skill in the art to practice the invention." *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002) (citing *In re Borst*, 345 F.2d 851, 855 (CCPA 1965)). "Whether a prior art reference is enabling is a question of law based upon underlying factual findings." *Id.* (citing *Crown Operations Int'l Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002)). "Anticipation is a question of fact. However, without genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a

matter of law." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1342–43 (Fed. Cir. 2005).

Schlehr issued on October 11, 1921 and therefore qualifies as prior art under 35 U.S.C. § 102(b). Like the '057 Patent, Schlehr discloses an open-ended wrench having tapered or tilted jaws. U.S. Patent No. 1,393,399, lines 81–93. Schlehr figures 4 and 5 depict the following:



*Id.* at figs. 4, 5. Foor issued on August 24, 1954 and therefore also qualifies as prior art under 35 U.S.C. § 102(b). Like Schlehr and the '057 Patent, Foor also discloses an open-ended wrench having tapered or tilted jaws. U.S. Patent No. 2,687,056, col. 3, lines 9–23, figs. 1, 3, 8, 10. Foor figure 1 depicts the following:



*Id.* at fig. 1.

Schlehr and Foor expressly disclose two of the three limitations in Claim 1. Indeed, neither Kabo nor its experts dispute that both Schlehr and Foor expressly disclose a wrench having: (1) "a handle and a head connected to an end of the handle and a first jaw and a second jaw extending from the head," (*see* JSP Mem., ECF No. 278, at 17 (citing Buckley, Rebuttal Expert Report ¶¶ 81–87, ECF No. 283 (not disputing JSP's contention that Schlehr and Foor disclose this first limitation)); Kabo Opp'n Mot. Summ. J., ECF No. 329, at 13 (not disputing JSP's contention that Schlehr and Foor disclose this first limitation)); with (2) "the first jaw having a first inclined surface defined in a first side thereof and the second jaw having a second inclined surface defined in a first side thereof, the first inclined surface and the second inclined surface respectively tapered toward two respective distal ends of the first and second jaws defining respective tilt angles relative to a horizontal plane," (*see* JSP Mem., ECF No. 278, at 18–19 (citing Buckley, Rebuttal Expert Report ¶¶ 81–87, ECF No. 283 (not disputing JSP's contention that Schlehr and Foor disclose this second limitation)); Kabo Opp'n Mot. Summ. J., ECF No. 329, at 13 (not disputing JSP's contention that Schlehr and Foor disclose this second limitation)). During the prosecution of the '290 Application, the Examiner reached the same conclusion. (Office Action, ECF No. 41-1, at 28–31 ("Either one of Foor (2,687,056) or Schlehr

(1,393,399) discloses all of the limitations of claim 1, i.e., a wrench comprising two jaws extending from the head, each having a first inclined surface in a first side thereof and tapering towards the end of the jaws and sharing a common plane that is inclined relative to a horizontal plane.")). However, neither Schlehr nor Foor expressly disclose Claim 1's third limitation: "the tilt angle relative to the horizontal plane of the first inclined surface is different from the tilt angle relative the horizontal plane of the second inclined surface, so that a thickness of the distal end of the first jaw is smaller than a thickness of the distal end of the second jaw." Indeed, JSP concedes that the cited prior art does not "expressly disclose that tilt angles of the two jaws differ or that one jaw is smaller than the other." (JSP Mem., ECF No. 278, at 19). Therefore, JSP's anticipation argument turns on whether Schlehr or Foor inherently disclose this limitation. The Court finds that they do.

> The Federal Circuit has established clear standards for inherent anticipation:
>
> A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention. *Lewmar Marine, Inc. v. Barient Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987). Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991).

*SmithKline*, 403 F.3d at 1343 (quoting *Schering*, 339 F.3d at 1377). "[T]he doctrine of inherent anticipation applies to the entire claimed subject matter just as it does to a single claimed feature." *Id.* Furthermore, the Federal Circuit has reiterated that "inherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created." *Id.* (citing *Schering*, 339 F.3d at 1377); *see also MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999) ("Where . . . the result is a necessary consequence of what was deliberately intended, it is of no import that the article's

authors did not appreciate the results."); *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1348–49 (Fed. Cir. 1999) ("Because 'sufficient aeration' was inherent in the prior art, it is irrelevant that the prior art did not recognize the key aspect of [the] invention . . . . An inherent structure, composition, or function is not necessarily known."). To prove inherent anticipation, a party need not demonstrate that it is "impossible" to practice the prior art without producing the disputed characteristic. *SmithKline*, 403 F.3d at 1344 (quoting *In re Oelrich*, 666 F.2d 578, 581 (CCPA 1981)); *see also Atlas Powder*, 190 F.3d at 1349–50 (affirming a district court's finding of inherent anticipation despite a finding that the inherent element could be avoided by taking "extraordinary measures" when practicing the prior art). Instead, "[a]ll that needs to be shown is that the outcome of the process be a 'natural result flowing from the operation as taught in the prior art.'" *Allergan*, ––– F.3d ––––, 2014 WL 2579287, at *6 (quoting *SmithKline*, 403 F.3d at 1344). Indeed, "[a] product would be inherently anticipated where it was a natural result of the prior art process, even when it would be possible to prevent the formation of the product through 'extraordinary measures.'" *Id.* (quoting *Atlas Powder*, 190 F.3d at 1349.).

"The public remains free to make, use, or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to operate. The doctrine of anticipation by inherency, among other doctrines, enforces that basic principle." *Atlas Powder*, 190 F.3d at 1348. JSP contends that it cannot, absent "extraordinary measures," produce the wrenches disclosed in Schlehr and Foor without violating Claim 1's third limitation. (Reply, ECF No. 363, at 10). Specifically, JSP contends that it is impossible to produce Schlehr and Foor wrenches, using the known technique, which requires hand-polishing, without at least some "difference" in jaw thickness or tilt angle. (JSP Mem., ECF No. 278, 19–22). In other words, and using the Court's construction of the term

"different," JSP contends that the known manufacturing process necessarily results in jaws that are "not identical." Thus, according to JSP, producing the prior art necessarily results in the infringement of the '057 Patent. This is indicative of invalidity.

The parties appear to agree that no wrench manufacturing process results in consistently perfect wrenches—i.e., wrenches with identical jaw thickness and tilt angle. (*See* JSP Mem., ECF No. 278, 19–22 (citing experts and fact witnesses for both parties)). In fact, Kabo's own expert has repeatedly agreed that all wrenches have differences in jaw thickness and tilt angle if measured precisely enough:

> Question: But if you decide to measure more precisely than the tolerance level, you can always find some difference between two jaws, right?
>
> Answer: Sure.

(Buckley Dep. Tr., 96:15–19, ECF No. 280-19, at 4).

> Question: So if – if all parts when they're manufactured, you know, have some variation I think you said, right? So if we have a good enough, precise enough piece of measuring equipment we could always find a difference in angle between two jaws on a wrench, right?
>
> Answer: Probably on wrenches, that is true. I've worked on some parts that you would be hard pressed to find the difference between even if you had an atomic microscope. So it is not always true, but it is true in a lot of things like common hand tools.

(*Id.* 106:6–17, at 7). Kabo neither disputes this testimony nor identifies any manufacturing process whereby JSP could produce "perfect" Schlehr and Foor wrenches and avoid the '057 Patent. (*See* Kabo Opp'n Mot. Summ. J., ECF No. 329, at 14–16). Instead, Kabo admits that when it filed the '057 Patent in 2004, "hand-polishing was a step in the wrench manufacturing process known to a person of ordinary skill in the art," (Kabo Opp'n to JSP Statement of Undisputed Material Facts ¶ 8, ECF No. 327, at 3), and cites nothing to rebut JSP's evidence "that the polishing process necessarily results in variations in the wrench surfaces because the

process is typically done by hand and depends upon the skill and technique of the operator," (JSP Mem., ECF No. 278, at 20 (citing Moore Dep. Tr., 175:6–178:19, ECF No. 280-16, at 6–7)). Thus, there is no genuine dispute that the public could not use the known steps in the manufacturing process to produce the Schlehr and Foor wrenches without infringing the '057 Patent. Stated another way, it is undisputed that the known manufacturing process naturally results in jaws and tilt angles that are "not identical." Under *Atlas Powder*, JSP is not required to take "extraordinary measures" to avoid this result. 190 F.3d at 1349–50. Further, that some Accused Products and prior-art wrenches demonstrate only very small differences in thickness or tilt angle is irrelevant.[1] The Federal Circuit has found inherent anticipation even in cases where the prior art included only "trace" amounts of the claimed feature. *SmithKline*, 403 F.3d at 1343. Kabo itself relies on microscopic differences as small as 1/100th of a millimeter to prove infringement, (Kabo Mot. Summ. J., ECF No. 294, at 21–23 (citing Buckley Expert Report, Measurement Table ¶ 89, ECF No. 282, at 32–33)), and, more importantly, under this Court's construction of the term "different," any difference in thickness or tilt angle is sufficient to infringe the '057 Patent. Kabo acknowledges this in its motion for summary judgment, arguing that "the tilt angles of the [A]ccused [P]roducts are 'different' because they are not identical." (*Id.* at 19). In this case, the critical question is whether the public can, absent extraordinary measures, practice the prior art, including Schlehr and Foor, without infringing the '057 Patent. Under Kabo's own theory of infringement, the answer is no. Accordingly, the Court finds each

---

[1] To the extent that Kabo contends that JSP cannot rely on a theory of "accidental anticipation," (*see* Kabo Opp'n Mot. Summ. J., ECF No. 329, at 13–16), it is plainly mistaken. "[I]nherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created." *SmithKline*, 403 F.3d at 1343. Kabo's arguments to the contrary are based on misunderstood or outdated authorities. (*See* Kabo Opp'n Mot. Summ. J., ECF No. 329, at 13–16).

of Claim 1's limitations anticipated by Schlehr and Foor. JSP's motion for partial summary judgment is therefore granted, and Claim 1 of U.S. Patent No. 7,066,057 is hereby declared invalid.

## CONCLUSION

IT IS HEREBY ORDERED that Claim 1 of U.S. Patent No. 7,066,057 is declared INVALID.

IT IS FURTHER ORDERED that JSP's motion for partial summary judgment (ECF No. 277) is GRANTED.

IT IS FURTHER ORDERED that Kabo's motion for partial summary judgment (ECF No. 294) is DENIED. The sealed version of the motion (ECF No. 298) is likewise DENIED.

IT IS FURTHER ORDERED that the pending motions to seal (ECF Nos. 281, 289, 297, 317, 328, 349, 357, 365) are GRANTED.

IT IS SO ORDERED.

Dated: This 25th day of July, 2014.

_____
ROBERT C. JONES
United States District Judge